## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MAY PAINTER, NICOLE HESLIP, MATHIAS CONDUFF, NATHANIEL MENDEZ-GUTIERREZ, RODNEY SHAW, MYLES THOMASON and JEFFREY DUPREX, on behalf of themselves and all others similarly situated,** | **Case No.  7:25-cv-4189-NSR** |
| **Plaintiffs,** | |
| **vs.** | |
| **STRIDES PHARMA, INC.** | |
| **Defendant.** | |

## BRIEF IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AGREEMENT AND CERTIFICATION OF SETTLEMENT CLASS

Plaintiffs and Defendant Strides Pharma, Inc., have reached an agreement (the "Settlement Agreement") that, if approved, will resolve Plaintiffs' class-wide economic loss claims related to the purchase of Strides's allegedly benzene-contaminated prescription testosterone gel. [*See* February 13, 2026, Declaration of Aaron K. Block ("Block Decl.") at Ex. 1.]. The parties reached this agreement after months of arms-length negotiations between experienced counsel and meaningful early discovery.

Through the Settlement Agreement, Strides has agreed to make cash payments for each prescription of its testosterone gel purchased from June 1,

2022 (Strides's first sales of the product), through July 31, 2025 (around five months after the March 5, 2025, FDA recall). The recovery amount is based on the price paid for each prescription and the year of purchase, and the claims process makes more than an estimated $8,925,600 available to the Settlement Class—more than 55% of the total amount paid by consumers over this period. Further, Strides has agreed to a non-reversionary payment of at least $750,000 to the Settlement Class, should claims made fall short of that amount. In addition to cash payments to the Settlement Class, Strides has reformulated its product to address the underlying issue and has agreed to continued testing to ensure that benzene-contaminated testosterone gel is not released again.

With respect to fees, there is no "clear sailing" agreement. Strides expressly retains the right to challenge Plaintiffs' entitlement to or the amount of any request for attorneys' fees, litigation expenses, or named plaintiff incentive awards. If awarded, Strides has agreed to pay any Court-ordered amount separately from the amount due to the Settlement Class. Strides has also agreed to cover the cost of settlement administration, estimated at up to approximately $299,607. [February 12, 2026, Declaration of Annette Kashkarian ("Kashkarian Decl.") ¶ 29].

Because these terms are fair, reasonable, and adequate, Plaintiffs respectfully ask the Court to certify the Settlement Class, grant preliminary approval of the Settlement Agreement, and approve the Class Notice.

### Plaintiffs' Statement of Facts and Procedural History

Plaintiffs assert economic loss claims on behalf of a nationwide class of individuals "who purchased Strides's testosterone gel product that was recalled due to benzene contamination or that similarly failed to meet the applicable CGMP requirements but was not recalled." [Dkt. 1 (Class Action Complaint) ¶ 47]. On March 5, 2025, Strides issued a Class II recall due to the "Presence of Benzene." [*Id.* ¶ 23 and Ex. 2]. Plaintiffs allege that this benzene contamination came "from an excipient Carbomer 940," a thickening agent used to make gels, used in the manufacturing process. [*Id.* at ¶ 23 and Ex. 1]. "Benzene is classified as a human carcinogen, a substance that could potentially cause cancer depending on the level and extent of exposure." [*Id.*].

Plaintiffs' counsel, who are experienced in matters of this type on both sides of the v., investigated a potential action for more than a month: evaluating evolving FDA regulatory standards and history; the regulatory file for the generic drug in question; the nature of carbomers, the history of benzene contamination via carbomers and the development of alternatives; prescription volume and pricing information; Strides's regulatory, enforcement, and litigation profile; and the applicable law. Plaintiffs' counsel also interviewed and otherwise vetted potential class representatives. [Block Decl. ¶ 6].

On May 9, 2025, Plaintiffs sent a pre-suit notice letter to Strides. [Dkt.

1 ¶ 65]. On May 14, 2025, counsel for Strides reached out and the parties held an initial video conference regarding the matter. [Block Decl. ¶ 7].

On May 19, 2025, Plaintiffs filed their Class Action Complaint, seeking to recover "the full purchase price" of Strides's allegedly benzene-contaminated testosterone gel, regardless of whether their purchases were part of the recall. [Dkt. 1 ¶ 51]. Because the benzene-contamination issue arose from the use of Carbomer 940—an ingredient in use for the life of the product up to the recall—Plaintiffs alleged that the "benzene contamination affects all lots in distribution and seemingly all historic lots." [*Id.* ¶ 26]. Plaintiffs also detailed FDA and other regulatory guidance and enforcement actions regarding benzene, up through December 28, 2023, when FDA published guidance entitled "Reformulating Drugs Products that Contain Carbomers Manufactured with Benzene." (the "Carbomer Guidelines") [*Id.* ¶¶ 17–23].

Based on this regulatory guidance and conduct, Plaintiffs alleged that Strides's benzene-contaminated testosterone gel failed to meet Current Good Manufacturing Practices ("CGMP") and other regulatory requirements and was therefore adulterated, illegal to sell, un-merchantable, and economically worthless. [*Id.* ¶¶ 38–43]. Seeking to recover economic damages, Plaintiffs brought claims for breach of warranty, fraud, and violation of consumer protection statutes, seeking to represent all purchasers nationally. [*See*

*generally id.* ¶¶ 58–95].

After Plaintiffs filed the Complaint, the parties remained in communication. [Block Decl. ¶ 8]. On June 11, 2025, Strides agreed to accept service and agreed to the service of subpoenas on key third-parties (*e.g.*, pharmacies and drug distributors) with data necessary for determining the scope and potential value of the case. [*Id.*]. The parties also agreed to focused party discovery, including Strides's sales volumes and years of production, as well as information sufficient to better understand the company's potential defenses. [*Id.*]. To facilitate this discovery, the parties negotiated and submitted a proposed Confidentiality Stipulation and Protective Order on July 2, 2025, which the Court entered on July 22, 2025. [Dkts. 12, 23]. The parties then received transactional data from subpoenaed third-party subpoenas and evaluated it against Strides's own sales data. Plaintiffs also conducted product testing and analyzed testing results through an independent laboratory. [Block Decl. ¶ 8].

Between August 29, 2025, and November 21, 2025, Strides requested and received multiple unopposed extensions to its deadline to file a responsive pleading. [Dkts. 14–19]. On December 12, 2025, the parties submitted a joint notice to "to advise the Court that this matter has reached a settlement" and "ask that [it] be adjourned for 60 days to give the parties time to finalize the agreement and prepare preliminary approval papers for

the Court's consideration." [Dkt. 20]. On December 15, 2025, the Court entered an order discontinuing the matter for sixty days, until February 13, 2026. [Dkt. 21]. This motion follows.

Throughout the period above, the parties were actively involved in targeted discovery and arms-length settlement negotiations. [Block Decl. ¶¶ 8–9]. By September 15, 2025, Plaintiffs had obtained enough data from Strides and third parties to make a preliminary estimate of class damages, informed by work with experts in similar litigation, which Plaintiffs shared with Strides as part of a formal settlement presentation. [*Id.*]. Over the following weeks and months, the parties actively engaged in negotiations, with multiple video calls, regular calls, written analysis, and exchanges of data and information. [*Id.*].

During these negotiations, the parties obtained sufficient data to meaningfully discuss and analyze Strides's potential damages exposure. Using Strides's own sales volume and returned product numbers, the parties were able to estimate the total quantity of Strides testosterone gel sold to consumers from its initial sales of the product in June 2022 until the recall in March 2025. The parties then used pharmacy data to calculate average out-of-pocket consumer payments for each box of Strides testosterone gel. Multiplying the average price to total volume resulted in the following:

| Year | Consumer Payments |
|------|-------------------|
| 2022 | $1,479,883.38 |
| 2023 | $7,569,027.41 |
| 2024 | $5,853,372.07 |
| 2025 | $686,006.75 |
| **Total:** | **$15,588,289.61** |

Block Decl. ¶ 10. The parties also discussed Strides's potential exposure to other categories of damages, such as punitive damages, statutory damages, and third-party payments under the collateral source rule. [*Id.* at ¶ 11].

During negotiations, Strides contested Plaintiffs' view that its benzene-contaminated drugs were "worthless" and drew further distinctions based on the time of purchase, due to two events: (1) the 2025 recall and (2) the FDA's December 28, 2023, publication of the Carbomer Guidelines. [*Id.* at ¶ 12]. Plaintiffs disagree with these arguments but acknowledge the uncertainty, cost, and delay of class-action litigation. After extensive negotiations, the parties reached the Settlement Agreement. [*Id.* at ¶ 13 and Ex. 1].

## The Settlement Agreement

Under the Settlement Agreement, Strides has agreed to make cash compensation available for every prescription of its testosterone gel consumers purchased from the company's initial sales of the product until after the recall, with the Settlement Class defined as follows:

> All natural persons in the United States who purchased Strides testosterone gel, for personal or household use, from June 1, 2022, until July 31, 2025.

[Block Decl. at Ex. 1 § I.A.].

The amount of agreed cash compensation depends on the year each prescription was purchased, with tiers to reflect a compromise evaluation of the claims. For prescriptions purchased in 2025, the year of the recall, Strides agreed to reimburse 100% of consumers' out-of-pocket costs. For 2024, after publication of the Carbomer Guidelines, Strides agreed to reimburse 75%. For earlier purchases, Strides agreed to reimburse 40%. Applying these percentages, the Settlement Agreement makes the following amounts available:

| **Year** | **Consumer Payments** | **%** | **Potential Recovery** |
|---|---|---|---|
| 2025 | $686,006.75 | 100 | $686,006.75 |
| 2024 | $5,853,372.07 | 75 | $4,390,029.05 |
| 2023 | $7,569,027.41 | 40 | $3,027,610.96 |
| 2022 | $1,479,883.38 | 40 | $591,953,35 |
| **Total Available:** | | | **$8,695,600.12** |

In addition to the payments above, the parties have agreed to the payment of a minimum base $3.50 per-prescription—as further modified by the percentages above—for purchases where consumers did not have out-of-pocket costs or paid less than $3.50. Plaintiffs estimate that these minimum payments make approximately an additional $230,000 available, for a total amount of available cash of around $8,925,600. This settlement amount is more than 55% of total consumer payments for the entire period.

In addition to agreeing to make the payments set out above through a

claims process that requires straightforward documentation, Strides has agreed to the payment of a non-reversionary amount of $750,000 to the Settlement Class. If claims made exceed this amount, Strides will fully pay all claims as set out above—there is no cap. But, if claims fall short of $750,000, Strides will distribute the difference to claiming members of the Settlement Class on a *pro rata* basis or otherwise as the Court directs. Strides has also agreed to pay notice and administration costs.

In addition to these payments, Strides has reformulated its drug to eliminate use of the benzene-containing ingredient, has agreed that it will not return to the use of Carbomer 940, and will implement measures to prevent the release of benzene-contaminated testosterone gel in the future.

With respect to attorneys' fees, litigation costs, and named plaintiff service awards, Strides has agreed to pay any amount ordered by the Court separate from the non-reversionary fund. But the parties "have no agreement regarding entitlement to or the amount of any Class Counsel Fees or incentive awards for the Representative Plaintiffs," and "Strides retains the right to contest any or all requested Class Counsel Fees and/or the Representative Plaintiffs' requested incentive awards."

With respect to the Release, the Settlement Agreement defines "Released Claims" to include only "economic loss claims" and "expressly excludes any personal injury and/or wrongful death claims."

The Settlement Agreement sets the following deadlines for notice, final approval, and related events:

| Event | Deadline |
|---|---|
| Deadline for commencement of notice and start of the claims period | 28 days after preliminary approval and approval of the form and method of notice |
| Last day to file Plaintiff's Petition for Attorneys' Fees and Costs | 14 days before objection and opt-out deadline |
| Last day for Settlement Class Members to object or opt-out to the Settlement and postmark deadline for filing claims | 60 days after the deadline for publishing the notice |
| Last day to file Motion for Final Approval of Settlement | 14 days before Final Approval Hearing |
| Deadline for Class Counsel to File List of Opt-Outs and respond to any objections<br><br>Supplemental Declaration from Settlement Administrator reflecting that the Settlement Class Notice Program was executed in accordance with the Preliminary Approval Order | 14 days before Final Approval Hearing |
| Final Approval Hearing | 15 days or later after the objection and opt-out deadline |

## Legal Authority and Analysis

"Rule 23(e) of the Federal Rules of Civil Procedure states that a class action settlement can be approved only after a district court has determined the settlement to be fair, reasonable, and adequate." *Kurtz v. Kimberly-Clark Corp.*, 142 F.4th 112, 115 (2d Cir. 2025). This process "typically occurs in two stages: (1) preliminary approval — where 'prior to notice to the class, a court

10

makes a preliminary evaluation of fairness,' and (2) final approval — where 'notice of a hearing is given to the class members, [and] class members and settling parties are provided the opportunity to be heard on the question of final court approval.'" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 27 (E.D.N.Y. 2019) (citations omitted).

To meet their burden at preliminary approval, the parties must "show[] that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Rule 23(e)(1)(B)(i)–(ii). If preliminary approval is granted, class notices moves forward and the case proceeds toward final approval, where "the court may approve [a class settlement] only after a hearing and only on finding that it is fair, reasonable, and adequate." Rule 23(e)(2).

Here, as explained below, the Court should grant preliminary approval of the Settlement Agreement and certify the Settlement Class. Further, the parties ask the Court to approve the Class Notice and Notice Plan, appoint Verita as Claims Administrator, appoint the undersigned as Class Counsel, and appoint the named plaintiffs as Class Representatives.

## I.    The Settlement Class satisfies Rule 23's requirements.

"To maintain a class action, plaintiffs must demonstrate that '(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of

the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.'" *Elisa W. v. City of N.Y.*, 82 F.4th 115, 122 (2d Cir. 2023) (quoting Rule 23(a)). "These requirements are known as numerosity, commonality, typicality, and adequate representation." *Id.*

"In addition to satisfying these requirements, plaintiffs must also show that one of the three conditions of Rule 23(b) is met." *Id.* As relevant here, "to certify a class pursuant to Rule 23(b)(3), a plaintiff must establish (1) predominance — 'that the questions of law or fact common to class members predominate over any questions affecting only individual members'; and (2) superiority — 'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Johnson v. Nextel Communs. Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (citations omitted). Finally, the Second Circuit has "recognized an 'implied requirement of ascertainability' in Rule 23 of the Federal Rules of Civil Procedure." *Brecher v. Republic of Arg.*, 806 F.3d 22, 24 (2d Cir. 2015).

### A. The Settlement Class satisfies numerosity.

"[N]umerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Here, there are an estimated 95,000 class members. Numerosity is satisfied.

## B. The Settlement Class satisfies commonality.

"A 'question[] of law or fact [is] common to the class,' . . . if the question is 'capable of classwide resolution—which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Johnson*, 780 F.3d at 137 (citations omitted). "Rule 23(a)'s commonality requirement may be satisfied if plaintiffs 'demonstrate that the class members 'have suffered the same injury.'" *Id.* (cleaned up; citations omitted). "'Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.'" *Id.* (citation omitted).

Here, Plaintiffs allege a broad range of issues that are capable of classwide resolution, including the nature of the alleged manufacturing defect, the value of any adulterated testosterone gel, the scientific and regulatory backdrop, Strides's knowledge and intent, and ultimately Strides's potential liability with respect to Plaintiffs' claims. [Dkt. 1 ¶¶ 54.a.–l.]. The Settlement Class therefore satisfies the commonality requirement.

## C. The named plaintiffs' claims are typical of the class.

"'Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Barrows v. Becerra*, 24 F.4th

116, 131 (2d Cir. 2022) (citation omitted). "The commonality and typicality requirements often 'tend to merge into one another, so that similar considerations animate analysis' of both." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (citation omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

Here, Plaintiffs all allege they purchased benzene-contaminated Strides testosterone gel that was un-merchantable and economically worthless, and they seek to recover the full purchase price of each prescription. [Dkt. 1 ¶¶ 8–14]. They therefore suffered the same economic injury as all consumers who "purchased Strides's testosterone gel product that was recalled due to benzene contamination or that similarly failed to meet the applicable CGMP requirements but was not recalled." [*Id.* ¶ 47]. Typicality is satisfied.

### D. The Settlement Class has been adequately represented.

To establish adequacy, Plaintiffs must "demonstrate that '1) their interests are not antagonistic to the interest of other members of the class and 2) their attorneys are qualified, experienced and able to conduct the litigation.'" *Cordes & Co. Fin. Servs. V. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 103 (2d Cir. 2007) (cleaned up). With respect to the named plaintiffs, "the

proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). "Courts find class counsel qualified when they are experienced and 'knowledge[able] in the area of complex class actions.'" *Cymbalista v. Jpmorgan Chase Bank, N.A.*, No. 20 CV 456 (RPK)(LB), 2021 U.S. Dist. LEXIS 99093, at *15 (E.D.N.Y. May 25, 2021) (quoting *In Re Payment Card*, 330 F.R.D. at 33). Plaintiffs meet these requirements.

With respect to class representatives, the named plaintiffs share common interests with the non-representative class members. As discussed above, each of the named plaintiffs purchased allegedly adulterated Strides testosterone gel, they each seek to recover economic damages, and none of them have any conflicts. [Block Decl. ¶ 6]. Their interests are fully aligned with unrepresented Settlement Class members.

With respect to counsel, Plaintiffs' attorneys have extensive experience litigating class actions and other complex litigation. For example, Class Counsel has successfully resolved plaintiff-side national class actions involving adulterated prescription drugs as appointed class counsel. [*See id.* ¶ 3]. In addition, Class Counsel have substantial experience representing pharmaceutical companies and other large corporate defendants in product liability, mass tort, and consumer class actions and regulatory matters.

15

[Block Decl. ¶¶ 3–4].

For these reasons, the named plaintiffs and counsel are adequate and should be appointed as Class Representatives and Class Counsel.

### E. The Settlement Class is ascertainable

"Ascertainability requires only that 'a proposed class is defined using objective criteria that establish a membership with definite boundaries.'" *Fikes Wholesale, Inc. v. Visa U.S.A., Inc.*, 62 F.4th 704, 716 (2d Cir. 2023) (quoting *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017)).

Here, the Settlement Class "definition meets that requirement by providing the timeframe ([June 1, 2022, to July 31, 2025]) and place (the United States) in which a particular group ([consumers who purchased Strides testosterone gel]) was allegedly harmed." *Id.* "That is all that is needed." *Id.*

### F. Common questions of law and fact will predominate.

Where money damages are sought, "Rule 23(b)(3) imposes two additional burdens on plaintiffs attempting to proceed by class action, namely, predominance and  superiority." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015). "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem Products, Inc. v. Windsor*, 521 U. S. 591, 623 (1997)).

"Predominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (citation omitted). Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (cleaned up; emphasis in original). Rather, it requires "that common questions '*predominate* over any questions affecting only individual [class] members.'" *Id.* (quoting Rule 23(b)(3); emphasis in original).

"[T]he predominance inquiry will sometimes be easier to satisfy in the settlement context." *In re Am. Int'l Grp. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012). For example, "concerns about whether individual issues would create 'intractable management problems' at trial drop out of the predominance analysis because 'the proposal is that there be no trial.'" *Id.* (quoting *Amchem*, 521 U.S. at 620).

Here, virtually all the issues in this case hinge on common questions and common evidence. For example, what Strides knew, when it knew it, what its related legal obligations were, and what effects the benzene contamination at issue had on the value of the testosterone gel are all

17

common issues, and resolving them would define the viability, scope, and strength of the economic loss claims that Plaintiff asserts on behalf of a class.

### G. The Settlement Class satisfies superiority.

With respect to superiority, "the Supreme Court has said[] Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *Catholic Health Care W. v. US Foodserv. (In re US FoodServ. Pricing Litig.)*, 729 F.3d 108, 130 (2d Cir. 2013) (citing *Amchem*, 521 U.S. at 617). Superiority is met where "substituting a single class action for numerous trials in a matter involving substantial common legal issues and factual issues susceptible to generalized proof will achieve significant economies of 'time, effort and expense, and promote uniformity of decision.'" *Id.* (quoting Rule 23 Advisory Committee Notes).

Here, for each member of the Settlement Class, bringing an individual lawsuit for the purchase price of Strides's testosterone gel would not be worth the cost of litigation, and requiring each Class Member to adjudicate a separate claim would be repetitive, wasteful, and a burden on the courts. Resolving these claims through this class action is therefore superior.

## II. The Settlement Agreement is fair, reasonable, and adequate.

The current version of Rule 23, adopted in 2018, includes "a list of four 'primary procedural considerations and substantive qualities that should

18

always matter to the decision whether to approve a settlement proposal.'"
*Moses v. N.Y. Times Co.*, 79 F.4th 235, 242 (2d Cir. 2023) (cleaned up; quoting
Rule 23(e)(2)). In addition to these statutory considerations, the Second
Circuit has held that "the revised Rule 23(e)(2) does not displace our
traditional *Grinnell* factors, which remain a useful framework for considering
the substantive fairness of a settlement." *Id.*

As set out below, the Rule 23(e)(2) requirements and the *Grinnell*
factors favor approval, and the Settlement Agreement is likely to be found
fair, reasonable, and adequate. The Court should therefore grant preliminary
approval and allow notice to go out to the Settlement Class.

## A. The Rule 23(e)(2) Requirements Favor Approval.

Through the 2018 revisions, Rule 23 "now mandates courts to evaluate
factors that may not have been highlighted in [the Second Circuit's] prior
case law, and its terms prevail over any prior analysis that are inconsistent
with its requirements." *Id.* at 243. These statutory factors are:

> (A) the class representatives and class counsel have adequately
> represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into
> account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing
>> relief to the class, including the method of processing class-
>> member claims;
>> (iii) the terms of any proposed award of attorney's fees,
>> including timing of payment; and

> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Rule 23(e)(2). "The first two factors are procedural in nature and the latter two guide the substantive review of a proposed settlement." *Id.* "Courts evaluating the fairness, reasonableness, and adequacy of a proposed settlement must consider the four factors outlined in Rule 23(e)(2) holistically . . . ." *Moses*, 79 F.4th at 243.

### i. The class has been adequately represented.

As set out above, both counsel and the named plaintiffs have adequately represented the class. *See, e.g.*, *Buchanan v. Pay-O-Matic Check Cashing Corp.*, No. 18-CV-885 (FB) (SMG), 2020 U.S. Dist. LEXIS 188658, at *16 (E.D.N.Y. Oct. 8, 2020) (relying on class certification analysis).

### ii. The Settlement Agreement was negotiated at arm's length.

While the Second Circuit no longer applies a presumption of fairness, "the arms-length quality of the negotiations remains a factor in favor of approving the settlement." *Moses*, 79 F.4th at 243. "The pertinent question is 'whether counsel had an adequate appreciation of the merits of the case before negotiating.'" *Carbone*, 2025 LX 561673, at *35 (quoting *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 475 (S.D.N.Y. 2013)).

As described in more detail above, the attorneys for each party have many years of experience litigating complex class actions, including pharmaceutical class actions, but had no prior relationship. Counsel established contact through Plaintiffs' pre-suit notice letter. After Plaintiffs filed their Complaint, 137 pages including exhibits, and Strides had an opportunity to evaluate it, the parties held further discussions regarding discovery necessary to understand case valuation and Strides's potential defenses. The parties then engaged in this early discovery by agreement, including both party discovery and the service of multiple subpoenas on third parties with data necessary to understand the scope and amount of consumer purchases (*e.g.*, national pharmacies and pharmacy benefits managers).

After obtaining sufficient discovery to estimate the class's potential recovery and continuing study of the strengths and weaknesses of the claims, the parties began discussing the range of estimated exposure and potential terms for a class settlement. Over the following months, the parties engaged in multiple rounds of negotiations through which they further refined the estimate of Strides's potential damages exposure, and Strides shared information relevant to its expected defenses. By mid-December 2025, the parties had reached an agreement in principle regarding the material terms of the Settlement Agreement and notified the Court. [Dkt. 20].

Here, the parties took care to ensure that they "had an adequate appreciation of the merits of the case before negotiating." *Beckman*, 293 F.R.D. at 475. Further, the parties did not negotiate any agreement on fees beyond providing that any award of fees will not diminish the recovery of the Settlement Class, so there is no potential conflict of the kind sometimes found in cases with a "clear sailing" provision. See, *e.g.*, *Watson v. Manhattan Luxury Autos. Inc.*, 2025 LX 478512, at *2-3 (S.D.N.Y. Oct. 10, 2025) ("'Separate negotiation of the class settlement before an agreement on fees is generally preferable' because simultaneous negotiation 'creates a potential conflict.'") (quoting *Manual for Complex Litigation (Fourth)* § 21.7 (2004)).

### iii.  The relief provided for the class is adequate.

The Settlement Agreement makes more than $8,925,600 available to the Settlement Class in uncapped cash payments, with notice and administration fees and any attorneys' fees to be paid separately. This amount represents more than 55% of the approximately $15,588,290 in out-of-pocket payments consumers made for Strides testosterone gel over the entire class period. Strides has also agreed to make a non-reversionary payment of $750,000 to members of the Settlement Class or as otherwise ordered by the Court, should claims made fall short of this amount.

This relief is adequate, considering the required statutory factors. First and foremost, "the costs, risks, and delay of trial and appeal" are significant.

Rule 23(e)(2)(C)(i). If this case did not settle, it would be expected to run for years, require the retention of multiple experts, and involve heavily litigated issues with respect to both the merits and class certification, as well as a potential appeal or appeals. Plaintiffs' ability to secure a Settlement Agreement that provides substantial reimbursement this early in the case weighs in favor of approval.

The next statutory factor—"the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims"—also weighs in favor of approval. Rule 23(e)(2)(C)(ii). The process will be conducted by a professional Claims Administrator, and the required documentation is straightforward. "Proof of purchase can be shown through any reliable means sufficient to establish (1) the individual making the purchase, (2) the date the purchase was made, (3) a NDC number or other manufacturer identification showing that the testosterone gel was Strides Testosterone Gel, and (4) the amount paid out-of-pocket, if any." Settlement Agreement § II.ii. This requirement can be satisfied through "a download or printout from their pharmacy, insurance company, or pharmacy benefits manager," which should be available to all consumers, or through "a copy of the purchase receipt." *Id.* Once a claim is made, it can be paid either by check or electronically. These procedures favor approval.

Third, "the terms of any proposed award of attorney's fees, including timing and payment" support approval. Fed. R. Civ. P. 23(e)(2)(C)(iii). "[W]hen reviewing the substantive fairness of a proposed settlement, 'the district court is required to review both the terms of the settlement and any fee award encompassed in a settlement agreement' in tandem.'" *Moses*, 79 F.4th at 244 (citation omitted). Here, the parties have reached no agreement on fees, and Strides retains the right to challenge Plaintiffs' forthcoming petition. Settlement Agreement § VI. "[T]he fact that attorney's fees are not awarded in the proposed Settlement Agreement but will instead be handled separately—and likely through motion practice—weighs in favor of preliminary approval." *C.K. v. McDonald*, No. 2:22-cv-1791 (NJC) (JMW), 2025 LX 351929, at *48 (E.D.N.Y. Aug. 19, 2025). As required, Plaintiffs will address this issue in greater detail in the final approval papers, after a fees petition has been filed. *See Kurtz*, 142 F.4th at 121.

Finally, the parties have entered into no "agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(iv). This factor therefore favors approval.

### iv. The proposal treats class members equitably.

The final statutory factor requires that "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(C)(iv). "Consideration under this Rule 23(e)(2) factor 'could include whether the

24

apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.'" *In re Payment Card*, 330 F.R.D. at 47 (citation omitted). Courts have found that a "*pro rata* distribution scheme is sufficiently equitable." *Id.*; *see also Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 667 (S.D.N.Y. 2015) (finding that a *pro rata* allocation plan "appear[ed] to treat the class members equitably . . . and has the benefit of simplicity").

Here, all members of the Settlement Class are entitled to recover cash payments based on their years of purchase and out-of-pocket expenditures, with a minimum payment for each prescription. The discount factors based on the year of purchase appropriately account for differences in the strength of the claims over time, as Strides has provided information demonstrating that it has a good faith reason to believe that its defenses are stronger with respect to earlier purchases than later purchases. This distribution is fair, reasonable, and equitable.

### B. The Remaining *Grinnell* factors support approval.

"Courts have found that Rule 23(e)(2) does not otherwise address the following *Grinnell* factors: the reaction of the class to the settlement (second factor); the stage of the proceedings and the amount of discovery completed (third factor); the ability of the defendants to withstand a greater judgment

(seventh factor); the range of reasonableness of the settlement fund in light of the best possible recovery (eighth factor); and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation (ninth factor)." *C.K. v. McDonald*, No. 2:22-cv-1791 (NJC) (JMW), 2025 LX 381301, at *25-26 (E.D.N.Y. Aug. 18, 2025) (collecting cases).

### i. The reaction of the class to the settlement.

"Where, as here, Class Members have not yet received notice of the settlement, Courts have found it too early to evaluate this *Grinnell* factor." *Carbone*, 2025 LX 561673, at *43. Should the Court grant preliminary approval, Plaintiffs will address the reaction of the Settlement Class in connection with their motion for final approval.

### ii. The stage of the proceedings and the amount of discovery completed.

Like the analysis above regarding the arm's-length nature of the settlement negotiations, "[t]he pertinent question is 'whether counsel had an adequate appreciation of the merits of the case before negotiating.'" *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 620 (S.D.N.Y. 2012) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004)). "Here, the parties conducted substantial targeted discovery, which provided them ample information from which to weigh the strengths and weaknesses of their claims." *Id.* (collecting cases involving "informal discovery" where

class settlements were approved). As described above, Plaintiffs conducted a substantial pre-suit investigation, received third-party data regarding national sales of Strides's testosterone gel through formal subpoenas, and received data and information from Strides regarding its sales of the drug and anticipated defenses. "Based on these circumstances, the parties were well-equipped to evaluate the strengths and weaknesses of the case." *Johnson v. Brennan*, 2011 U.S. Dist. LEXIS 105775, at *28 (S.D.N.Y. Sep. 16, 2011) (collecting cases involving early class settlements based on informal discovery). This factor therefore weighs in favor of approval.

### iii. The ability of the defendants to withstand a greater judgment.

"'Courts have recognized that a Defendant's ability to pay is much less important than the other *Grinnell* factors, especially where the other factors weigh in favor of approving settlement.'" *Charles v. Op. Access Corp.*, No. 16-CV-6868 (KAM) (JO), 2020 U.S. Dist. LEXIS 45633, at *16 (E.D.N.Y. Mar. 13, 2020) (quoting *In re Sinus Buster Prods. Consumer Litig.*, 2014 U.S. Dist. LEXIS 158415, at *11 (E.D.N.Y. Nov. 10, 2014).

Based on Plaintiffs' analysis of the regulatory filings of Strides's India-based parent company, Plaintiffs do not have acute concerns about the company's ability to withstand a judgment. The defendant's financial condition is essentially neutral.

### iv.  The range of reasonableness of the settlement fund.

"The range of reasonableness of the settlement in light of the best possible recovery, and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation, are two *Grinnell* factors that are often combined for the purposes of analysis." *In re Payment Card*, 330 F.R.D. at 47-48. "'In order to calculate the "best possible" recovery, the Court must assume complete victory on both liability and damages as to all class members on every claim asserted against each defendant in the Action.'" *Id.* at 48 (citation omitted). "The range of reasonableness is 'a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Id.* (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 119 (2d Cir. 2005)).

As a starting point to calculate the best possible recovery, members of the Settlement Class paid an estimated $15,588,290 for Strides testosterone gel. In addition, third-party payors made $66,258,350 in payments on behalf of members of the Settlement Class, which Plaintiffs seek to recover under the collateral source rule, for a total potential recovery of $81,846,640. Plaintiffs also seek to recover punitive damages and, where available, statutory damages. Assuming up to treble damages via these enhancers, the

maximum possible theoretical recovery at trial could be as high as approximately $245 million.

The road to get there, however, is long, arduous, and full of risk. *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 620 (S.D.N.Y. 2012) ("'Litigation inherently involves risks.'") (citation omitted). The out-of-pocket payments of members of the Settlement Class stand on the most solid foundation as a category of damages, but Strides has indicated that it will challenge even that baseline on multiple fronts. With respect to other categories of damages, the path to judgment is more difficult.

Applying these considerations here, the Settlement Agreement makes more than $8,925,600 available to members of the Settlement Class. That is more than 55% of their total payments for the testosterone gel at issue. *See In re Graña Y Montero S.A.A. Sec. Litig.*, No. 17-CV-01105 (LDH) (ST), 2021 U.S. Dist. LEXIS 153192, at *37 (E.D.N.Y. Aug. 13, 2021) (approving settlement providing for the recovery of between 15% and 24% of "reasonable recoverable damages"); *Mikhlin v. Oasmia Pharm. Ab*, No. 19-CV-4349 (NGG) (RER), 2021 U.S. Dist. LEXIS 66719, at *23-24 (E.D.N.Y. Jan. 6, 2021) ("Courts in this Circuit commonly find that settlements for less than half of potential damages are within the range of reasonableness."). This factor therefore weighs in favor of approval.

As set out above, considering the statutory and *Grinnell* factors, the Settlement Agreement is fair, reasonable, and adequate, and the Court should grant preliminary approval.

### III.    The proposed class notice plan should be approved.

"When a class is certified under Rule 23(b)(3), . . . the court must direct to class members notice and the opportunity to request exclusion from the class." *Jianmin Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 255 (2d Cir. 2021); *see also* Rule 23(C)(2)(B). "Where, as here, notice is to be provided to a settlement class that is proposed to be certified under Rule 23(b)(3), the Court is required to 'direct to class members the best notice that is practicable under the circumstance[s].'" *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 702 (S.D.N.Y. 2019). This requires the Court to approve both the method and substance of the notice in light of Rule 23 and Due Process requirements. "'The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness.'" *Id.* (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 113 (2d Cir. 2005)).

As set out below, the class notice in this case has been developed and will be conducted by an experienced third-party administrator, the method of notice complies with all applicable requirements, and the content of the notice complies with all applicable requirements.

### A. The class notice was developed and will be conducted by an experienced third-party claims administrator.

Strides has retained a professional claims administrator, Verita Global, LLC ("Verita"), that developed and will conduct the class Notice Plan. [*See generally*, Kashkarian Decl.]. Verita is an industry leader that has been retained to administer more than 10,000 class actions and has distributed settlement payments totaling well over a trillion dollars in assets, with experience including many of the largest and most complex administrations of both private litigation and of actions brought by state and federal government regulators. [*Id.* ¶ 4]. Verita has administered class action settlements for hundreds of consumer class actions, including pharmaceutical class actions. [*Id.* ¶ 6].

Given this experience, Verita is familiar with, and guided by, Constitutional due process provisions, the Federal Rules of Civil Procedure, and the relevant case law relating to legal notification. [*Id.* ¶ 4].

### B. The method of notice meets all requirements.

In a Rule 23(b)(3) class action, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B).

"The final sentence of this Rule, which allows for notice to be effectuated through electronic and 'other appropriate means,' was added on December 1, 2018. In its notes to the 2018 amendment, the Advisory Committee emphasized that courts should consider technological innovation to determine what constitutes the best method of notice in a particular case." *In re Emulsion (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 527 F. Supp. 3d 269, 273 (E.D.N.Y. 2021).

"'The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class.'" *Id.* (quoting Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, at 3 (2010)). "[A] notice plan that reaches between 70 and 95 percent of the class is reasonable." *Id.* In pharmaceutical class actions where direct contact information for consumers is held by third parties, a notice plan that reaches "consumers primarily through an online media campaign" can be the best notice practicable under the circumstances. *Id.* (rejecting argument that Plaintiffs were required to subpoena 20-plus third parties to obtain information for direct notice); *see also*, *e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004) (approving indirect notice plan and noting "that neither the plaintiffs nor DuPont had access to the names and addresses of the multitude of people nationwide who purchased Coumadin

because the identity of pharmaceutical purchasers is confidential information that cannot be disclosed without patient consent.").

Consistent with *In re Emulsion* and similar authority, Verita has designed a digital media campaign to reach likely Settlement Class Members. [Kashkarian Decl. ¶¶ 20–22]. The media campaign consists of highly targeted digital banner and newsfeed advertisements that will be placed on a variety of websites and social media platforms, including Facebook and Reddit. This digital advertising will allow multiple impressions to be delivered to likely Settlement Class Members and allow viewers to click on a banner or newsfeed advertisement and instantly be directed to the Settlement Website. [*Id.* ¶ 20].

Once implemented, this digital media campaign will consist of approximately 166,200,000 impressions distributed programmatically via various websites (through Google's Display Network) and via targeted social media, for a duration of sixty days. [*Id.* ¶ 22]. The notices will appear on both desktop and mobile devices, including tablets and smartphones, in display and native ad formats. All digital media notices will include an embedded link to the settlement website. The digital and social media campaign will be managed and routinely monitored by Verita's in-house media team to ensure control and oversight. [*Id.*]. Verita estimates that notice distributed through

this media campaign will reach approximately 70% or more of likely Settlement Class Members. [*Id.*].

In addition to this media campaign, Verita will establish and maintain a case-specific website to allow Settlement Class Members to obtain additional information about the settlement, including the short- and long-form notice, important dates and deadlines, and relevant court filings from the action. [*Id.* ¶ 23]. Settlement Class Members will be able to complete their claim forms online or by printing and mailing them. [*Id.* ¶ 24]. Once the Claims Period ends, Verita will prepare a Distribution Report for review and approval by the Court at the final approval hearing. [*Id.* ¶ 25].

Beyond the website, Verita will (1) establish and host a case-specific toll-free number that will allow Class Members to listen to answers to frequently asked questions and request to have additional information mailed to them, (2) establish a case-specific email address to allow Class Members to correspond directly with Verita regarding the settlement, and (3) establish and monitor a settlement mailbox where Settlement Class Members may submit case correspondence." [*Id.* ¶¶ 26–28].

The method of notice set out above and in the Kashkarian Declaration is the best notice practicable under the circumstances, it is consistent with Second Circuit law and Due Process, and it should be approved.

## C. The content of the notice meets all requirements.

By statute, the class "notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B). While the notice must cover these topics, "[t]here are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'" *Wal-Mart Stores*, 396 F.3d at 114 (citation omitted).

The proposed notice documents in this case meet all these requirements. [*See* Block Decl., at Ex. 1 (Settlement Agreement) at Exs. B (Long-Form Notice) and C (Short-Form Notice)].

The Short-Form Notice is a two-page document in plain, simple language that describes (i) the nature of the action, [Settlement Agreement at Ex. C ("What's This All About?")]; (ii) the definition of the class certified, [*id.* at ("Am I Affected?")]; (iii) the class claims, issues, or defenses, [*id.* at

("What's This All About?")], (iv) that a class member may enter an appearance through an attorney if the member so desires, [*id.* at ("What Are My Other Options? . . . "You can appear on your own behalf or through an attorney, but you do not have to.")]; (v) that the court will exclude from the class any member who requests exclusion, [*id.* at ("What Are My Other Options? . . . Exclude Yourself by ___, 2026")]; (vi) the time and manner for requesting exclusion, [*id.*]; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3), [*id.* (informing class members that, if they do not opt out, they "will give up your right to sue Strides or the other released parties for any economic loss related to Strides testosterone gel purchased between June 1, 2022, and July 31, 2025.")].

In addition to meeting the requirements of Fed. R. Civ. P. 23(c)(2)(B), the Short-Form Notice meets Due Process requirements. It informs Class Members (1) of the nature of the pending litigation ("What's This All About"), (2) of the settlement's general terms ("What Does the Settlement Provide" and "How Do I Get a Payment"), (3) that complete information is available from the court files (identifying case information and directing consumers to the settlement website, where case filings are published), and (4) that any class member may appear and be heard at the Fairness Hearing. ("Go to a Hearing on ____, 2026 – If you remain in the Settlement but want to speak in

Court about the fairness of the Settlement, you can appear at a hearing on

___, 2026, and ask the Court for permission to speak at the hearing."). [*Id.*].

While the Short-Form Notice meets all statutory and Due Process

requirements on its own, as set out above, it also provides instructions for

accessing the Long-Form Notice. [*See* Ex. B to the Settlement Agreement].

The Long-Form Notice is a sixteen-page document that provides more

detailed information regarding each of the items addressed by the Short-

Form Notice and answers thirty-three questions regarding the litigation and

Settlement Agreement. [*Id.*].

Because the proposed method and content of the proposed class notice

meet all applicable requirements, Plaintiffs respectfully ask that the Court

approve the class Notice Plan and appoint Verita to administer it.

## Conclusion

For the foregoing reasons, the Court should certify the Settlement

Class, preliminarily approve the Settlement Agreement, approve the class

Notice Plan, appoint Verita as Claims Administrator, appoint the named

plaintiffs as Class Representatives, and appoint The Block Firm as Class

Counsel.

Dated: February 13, 2026

        **THE BLOCK FIRM LLC**
        *Attorneys for Plaintiff Sheryl Boyer,*
        *on behalf of herself and all others*
        *similarly situated*

By: */s/Aaron K. Block*
    Aaron K. Block (*pro hac vice*)
    Max Marks (*pro hac vice*)

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the above brief complies with the word count limit set out in Local Rule 7.1(c).

<u>/s/ Aaron K. Block</u>
Aaron K. Block (*pro hac vice*)